UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THERESA B. FOX, | |
| Plaintiff, | |
| v. | No. 16 C 5715 |
| | Judge James B. Zagel |
| MANLEY, DEAS, & KOCHALSKI, LLC and SETERUS, INC, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Theresa B. Fox brings claims under the Real Estate Settlement Procedures Act, and Illinois state law against Defendant Seterus, Inc., and she brings a claim under the Fair Debt Collection Practices Act against Defendant Manley, Deas, & Kochalski (MDK).

Both Defendants' Motions to Dismiss are before me. For the following reasons, Seterus's motion is granted in part and denied in part, and MDK's motion is granted.

## BACKGROUND

The following facts are taken from the Plaintiff's Complaint and are accepted as true for purposes of resolving these motions to dismiss. Fox owns a home in Chicago on 1854 North Kedzie Ave. She alleges that she has maintained this home as her primary residence. This case arises out of the foreclosure proceedings that were initiated against Fox in Illinois state court in November 2011. The court entered judgment against Fox in those foreclosure proceedings in April 2013.

**A. The Trial Period Plan**

In January 2014, Fox submitted a loss mitigation application to her mortgage loan

servicer at the time, Bank of America, N.A. ("BANA"). In February 2015, BANA approved Fox for a trial period plan (TPP) under the federal Home Affordable Modification Program (HAMP).

Under the TPP offer, Fox would be required to make three monthly payments of $1,229.54 to BANA. If she made these payments, her mortgage servicer would permanently modify her mortgage. The TPP also ensured that BANA would not sell the home at a foreclosure sale if Fox complied with the TPP terms. BANA could go forward with a sale if it informed Fox of the sale in writing or if Fox did not qualify for a permanent loan modification.

BANA sent Fox this TPP offer on February 3, 2015, instructing Fox that she could accept the offer by making her first monthly payment in a timely manner. Fox sent her first payment to BANA on March 9, 2015. She sent her second payment under the TPP to BANA on March 25, 2015. At some point in March 2015, BANA transferred the servicing rights on Fox's loan to Defendant Seterus. On April 27, 2015, Fox sent her the third TPP payment by check to Seterus.

After completing the three months payment required under the TPP, Fox continued to send a monthly check to Seterus up until she filed this complaint in May 2016. Despite making these payments, she never received a permanent modification of the loan. In September 2015, Fox hired an attorney to follow up with Seterus about the status of her permanent modifications. On September 16, 2015, a Seterus representative said that the final modification process was delayed because of the transfer from BANA. When Fox's attorney called again in October 2015, a Seterus representative said that no notes had been entered on Fox's loan record. During this October call, the Seterus representative told Fox's attorney that her matter was being "escalated" and that there should be enough time to cancel or postpone the scheduled November 23, 2015 foreclosure on Fox's home. On November 9, a Seterus representative requested a copy of the TPP because the company did not have enough information about the TPP in their system.

Between November and the filing of this Complaint in May 2016, Fox's attorney contacted Seterus at least 16 times. The attorney was continually advised that Fox's matter was escalated, and the file was in the process of converting the TPP to a permanent modification.

In February 2016, Seterus stopped accepting the monthly payments from Fox. The company returned Fox's check for $1230 uncashed, saying "the funds are insufficient to bring the loan current, and the item must be certified." This happened again in March 2016. In April 2016, Seterus notified Fox that the loan was being transferred to a new servicer, Selene. At the time of Seterus's transfer to Selene, no permanent modification of the loan had taken place.

**B.     The Foreclosure Sale**

Because of her inability to receive a permanent loan modification, Fox took steps to prevent her home from being sold in a foreclosure sale. A sale was scheduled for November 23, 2015. Fox's attorney contacted Seterus's attorney, Defendant MDK, to request a stay or continuance of the foreclosure prior to the November 23 sale. MDK refused to voluntarily cancel the sale. When Fox's attorney said he would need to file an emergency motion to stay the foreclosure, the MDK attorney said that he would seek sanctions if such a motion were filed.

On November 12, 2015, Fox filed an emergency motion in Illinois state court seeking a stay of the November foreclosure. MDK did not follow through on the threat to seek sanctions. The court granted Fox's motion to stay for a period of 60 days.

A new foreclosure sale of the home was scheduled to occur on May 2, 2016. At no point did Defendants Seterus or MDK take steps to cancel or stay the sale. Fox alleges that Seterus and MDK caused notice of the sale to be published on March 30, 2016, April 6, 2016, and April 13, 2016. On April 27, 2016, Fox filed another emergency motion to avoid having the house sold. The court granted Fox's motion to stay the May sale.

C.     **Public Records**

The parties have also cited documents in the public record, which I can consider when ruling on a motion to dismiss. Fox has filed for bankruptcy and documents filed in those bankruptcy proceedings show a tenant residing at the Kedzie home as of April 2014. Filings in that bankruptcy from January 2015 list the same tenant residing at the Kedzie home. Furthermore, the bankruptcy filings show that Fox owns up to ten properties, all rented out to tenants. Fox states in her briefs that she listed the Kedzie home as her address on her bankruptcy filing and claimed it as exempt, but she has not filed these bankruptcy records with this Court.

## LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) does not test the merits of a claim, but rather the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In deciding a 12(b)(6) motion, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *Id.* at 1521. To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a Rule 12(b)(6) motion, the Court may also consider documents attached to the pleading without converting the motion into one for summary judgment. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012). Fox has attached the TPP approval form that BANA sent her, proof of payments to her mortgage servicers, and other documents produced in the course of her relationship with the defendants. The Court may also consider public documents that are proper subjects for judicial notice, though "caution is necessary, of course." *Id.*

## DISCUSSION

Because the allegations against MDK arise out of Fox's dispute with Seterus, I consider Fox's claims against Seterus before turning to the claims against MDK.

### A. Fox's Claims Against Seterus

Fox asserts causes of action against Seterus for (1) breach of contract under Illinois law; (2) promissory estoppel under Illinois law; (3) violations of the Real Estate Settlement Procedures Acts, 12 U.S.C. § 2601 *et seq.* ("RESPA"); and (4) violations of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA").

### 1. Breach of Contract

To state claim for breach of contract under Illinois law, a plaintiff must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)).

Seterus challenges whether a valid and enforceable contract exists in this case. Because Seterus obtained the servicing rights to Fox's mortgage from BANA, the Court looks to BANA's relationship with Fox to determine whether there is a contract here. On February 3, 2015, BANA sent a TPP offer letter to Fox. The parties agree that this offer could only be accepted through submission of the first monthly payment in a "timely manner." But they disagree about whether payment on March 9, 2015 was timely. Seterus argues that the offer letter required a payment by March 1, 2015 for acceptance. Fox argues that any payment submitted in the month of March would be a timely payment under the terms of the offer letter.

The first page of the offer letter reads: "To accept this offer, you must make your first

monthly 'trial period payment.' To qualify for a permanent modification, you must make the following <u>trial period payments in a timely manner</u>:" Just below this language is a box that says "1st payment: $1,229.54 by 03/01/2015 Initial Trial Acceptance Payment." Seterus argues that this due date establishes that a payment must be submitted by March 1, 2015 to accept the offer in a timely manner.

But just following the box with the March 1 due date, the author of the letter contemplates that a borrower can miss the initial due date without offer termination. The BANA representative wrote, "If each payment is not received by Bank of America in the month in which it is due, this offer will end and your loan will not be modified under the Making Home Affordable Program."

Seterus also points to language on the fourth page of the TPP offer. Under the header "Additional Trial Period Plan Information and Legal Notices," the letter reads: "The terms of your trial period plan below are effective on the day you make your first trial period payment, provided you have paid it on or before March 1st, 2015."

The natural reading of the first page of this offer letter is that it sets out a due date for each month's payment on the first of the month. But the letter expressly states that the deadline for the offer could extend beyond the due date to the end of the month. The language on the fourth page speaks only to the additional terms of the contract outlined on that page, rather than addressing how a borrower may accept the offer. None of the additional terms on the fourth page address contract acceptance. The first page alone addresses what is required to accept the offer in a timely fashion, and the language on that page allows a borrower to accept the contract by submitting payment within the same month as the deadline.

This interpretation of BANA's offer is consistent with the guidance BANA received from

the Making Home Affordable Program. HAMP publishes a handbook for mortgage servicers, proving guidance on implementing a mortgage loan modification. It is appropriate for this Court to understand BANA's communication in light of the published HAMP Guidelines. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 565 (7th Cir. 2012) (turning to the HAMP Guidelines to determine the "reasonable expectations" of the parties to a TPP agreement). Fox cites the most recent publication of the Making Home Affordable Program's *Handbook for Servicers of Non-GSE Mortgages* to provide context of BANA language, but the more appropriate document to reference is the version of the handbook BANA would have referenced when offering Fox a TPP in February 2015. Both the current version, Version 5.1, and the version in place in early 2015, Version 4.4, state, "The servicer's receipt of the first payment due under the TPP Notice on or before the **last day of the month in which the first payment is due** (TPP Offer Deadline) is evidence of the borrower's acceptance of the TPP Notice and its terms and conditions." Making Home Affordable Program, *Handbook for Servicers of Non-GSE Mortgages* 127 (V4.4 2014) (emphasis added). This provision accords with this Court's interpretation of the BANA offer letter. The letter sets out two distinct dates: payment due dates and an offer deadline. The letter set a March 1, 2015 due date for the first payment, with a TPP offer deadline at the end of that first month. The Handbook further stresses that mortgage servicers should reach out when a payment due date is missed to "encourage submission of the first payment prior to the TPP Offer Deadline." *Id.* These instructions to mortgage servicers further support the conclusion that the most reasonable interpretation of the BANA letter is one that allows offer acceptance after the initial due date, so long as it is in the same month as that date.

Because Fox submitted her payment on March 9, 2015, and the BANA offer letter permitted her to accept the offer through a payment before the end of March, she effectively

accepted BANA's offer. Fox has sufficiently alleged that a contract was formed between Fox and BANA, and Seterus is BANA's successor in interest.

Seterus next argues that even if a contract exists, Seterus never breached the contract. Fox alleges that Seterus breached the TPP in two ways: (1) Seterus breached when it refused to accept Fox's payments in February and March of 2016, and (2) Seterus breached when it failed to convert Fox's TPP into a permanent mortgage modification.

Seterus's refusal to accept payments does not constitute a breach. Nothing in the TPP agreement requires the mortgage servicer to accept any payments beyond the three listed on the first page of the TPP offer, due in March, April, and May of 2015.

But Seterus's alleged failure to convert the TPP to a permanent mortgage modification does constitute a breach. The TPP states that "after all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified." Fox has alleged that she submitted all her payments before the end of the month in which they were due, and there are no allegations that Fox failed to submit required documents. Yet despite Fox's performance of her end of the bargain, Seterus never offered a permanent loan modification.

Fox has stated a claim under Illinois law for breach of contract, and Seterus's motion to dismiss Count I is denied.

## 2. Promissory Estoppel

To state claim for promissory under Illinois law, a plaintiff must allege "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiffs reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (citing *Quake*

*Constr., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill.1990)).

Fox's promissory estoppel claim arises out of the assurances she received from Seterus that the company was in the process of converting her TPP into a permanent loan modification. A Seterus representative told Fox's attorney that the matter was being escalated, that there would be time to address the issue before foreclosure proceedings, and that the conversion was in process. Fox argues that these communications constitute an unambiguous promise that a permanent loan modification was forthcoming.

While Fox may have alleged that Seterus made confusing and often frustrating representations about the status of her loan modification, these allegations do not arise to the level of an unambiguous promise. Fox alleges representations from Seterus that suggest the company was exploring a permanent modification and running a review process, but Fox has not alleged that Seterus offered a guarantee that the process would be resolved in her favor.

While the underlying contract between Fox and Seterus does contain a promise to convert the TPP to a permanent loan modification, Illinois law does not permit a claim for promissory estoppel to supplement a well-pleaded claim for breach of contract. *See Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005). Rather, the doctrine only applies to fill the gap where all other elements of a contract exist, but consideration is lacking. *Id.* Here, Fox has alleged all elements of a contract with regard to the initial TPP agreement with BANA but has failed to allege any sort of separate promise with Seterus that arose from communications with Seterus representatives in late 2015. Seterus's assurances that Fox's TPP was under review did not rise to the level of an unambiguous promise required to state a claim for promissory estoppel.

For these reasons, I am dismissing Count II of Fox's Complaint.

**3. RESPA Violations**

Fox next claims that Seterus violated RESPA when it failed to take action to prevent a foreclosure in November 2015 and May 2016, compelling Fox to take her own legal action to stay the foreclosure.

RESPA's implementing regulations provide:

> If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale unless . . .
>
> (2) the borrower rejects all loss mitigation options offered by the servicer; or
>
> (3) The borrower fails to perform under an agreement on a loss mitigation option.

12 C.F.R. § 1024.41(g).

This Section addresses the practice of "dual tracking" in which "the lender actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options." *Gresham v. Wells Fargo Bank, N.A.*, 642 F. App'x 355, 359 (5th Cir. 2016).

There are no allegations here that Seterus moved for a foreclosure judgment prior to Fox's loss mitigation application. The foreclosure judgment far preceded BANA's TPP offer. Rather, Fox's claim is based on two allegations. First, Fox alleges that she successfully accepted the TPP offer and fulfilled her requirements under that loss mitigation option. While Seterus argues that Fox missed the deadline to accept the offer, I reiterate my conclusion that Fox accepted the TPP offer and fully performed her end of that agreement.

Fox also alleges that Seterus conducted a foreclosure sale in violation of § 1024.41(g) when the company refused to take action to prevent that sale, moved forward with scheduling a new sale in May 2016 once Fox took legal action to prevent the November sale, and published

notices of the May 2016 sale.

Seterus argues that these allegations are not enough to state a claim under RESPA. The company interprets § 1024.41(g) to require an actual foreclosure sale. Under this view, there can be no violation of that section unless a foreclosure sale actually took place. To support this view, Seterus cites the Consumer Financial Protection Bureau's official interpretations of § 1024.41(g) which allow a mortgage servicer to proceed with "publication, arbitration, or mediation requirements established by applicable law" so long as these proceedings "do not cause or directly result in…the conduct of a foreclosure sale." *See* Official Commentary to 12 C.F.R. § 1024.41(g) at n.2.

But the alleged conduct by Seterus goes beyond the sort of incidental conduct to a prior foreclosure judgment that is permitted under the CFPB's commentary. The company did not merely publish notice of an already-scheduled foreclosure but actively participated in rescheduling the foreclosure after Fox took unilateral action to prevent the initial sale from taking place. Fox alleges Seterus was considering offering Fox a permanent loan modification while at the same time it was ensuring that a new foreclosure date was on the calendar. This is exactly the sort of dual tracking that § 1024.41(g) prohibits. Even if Seterus's actions did not directly result in a sale, the actions *would* have caused a sale had Fox not taken action on her own to obtain a stay. Seterus is not permitted to evade RESPA liability purely because of the borrower's unilateral steps to thwart a foreclosure sale. *See Lindsay v. Rushmore Loan Mgmt.*, No. PWG-15-1031, 2016 WL 1169957, at *2 (D. Md. Mar. 25, 2016) (denying the defendant's motion to dismiss a § 1024.41(g) claim when "the only reason why the sale was cancelled was because Plaintiffs requested and received an emergency stay").

By alleging that Seterus was engaged in conduct that would cause a foreclosure sale,

11

even after the borrower had complied with the TPP, Fox sufficiently stated a claim under § 1024.41(g). Seterus's motion to dismiss the RESPA claims is denied.

**4. Illinois Consumer Fraud Act Claims**

Fox also alleges a breach of the Illinois Consumer Fraud Act (ICFA). This statute prohibits "unfair methods of competition and unfair or deceptive acts or practices …in the conduct of any trade or commerce." 815 ILCS 505/2. Unfair practices include the use of any "deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission or any material fact." *Id.*

Fox's Complaint mostly recites the elements of an ICFA claim without providing the specifics necessary to state a plausible claim. I must disregard these recitations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The only specific details Fox offers to support her allegations of an ICFA claim are that Seterus (1) breached the terms of the TPP, (2) compelled Fox to retain counsel to obtain a stay in the foreclosure, (3) caused Fox to suffer distress through the fear of an impending foreclosure.

The Seventh Circuit has held a plaintiff must allege more than "simple breach of contract" to state an ICFA claim. *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 400 (7th Cir. 2011). Rather, the plaintiff must allege an "affirmative act of misrepresentation." *Id.* Under Illinois law, an ICFA claim must "involve[ ] more than the mere fact that a defendant promised something and then failed to do it." *Zankle v. Queen Anne Landscaping*, 724 N.E.2d 988, 993 (2000).

Fox has not alleged anything more than the breach of the TPP. While she alleges that Seterus offered frustratingly ambiguous responses to her inquiries, none of these communications misrepresented the status of her loan. Seterus asked for more paperwork, said

the process was ongoing, and at times suggested that Fox failed to comply with the TPP. These alleged actions may have been confusing, but they were not deceptive. Any damage Fox has suffered as a result of her communications with Seterus stems from the company's inaction in pursuing a foreclosure stay or the company's delay in processing her loan. Neither inaction nor delay constitutes a deceptive act or unfair practice under the ICFA.

Fox has failed to allege sufficient facts to state an ICFA claim, and I am dismissing the ICFA count from the Complaint.

**B.     Fox's Claims Against MDK**

Turning to the second defendant in this case, Fox alleges that MDK, Seterus's law firm, violated the Fair Debt Collections Practices Act (FDCPA). To state a claim under the FDCPA, a plaintiff must allege (1) she is a natural person or consumer harmed by violations of the FDCPA, (2) that the debt arises from a transaction entered for personal, family, or household purposes, (3) that the defendant is a debt collector, and (4) that the defendant violated a provision of the FDCPA. *See Pantoja v. Portfolio Recovery Associates*, LLC, 78 F.Supp. 3d 743, 745 (N.D. Ill. 2015). The parties do not dispute that MDK was in the role of a debt collector when representing Seterus. MDK contests whether Fox has pled the other three elements, arguing that Fox is not a consumer for purposes of this debt, that the debt did not arise from the type of transaction governed by the statute, and that Fox has not alleged action that would violate a provision of the FDCPA.

**1.     The Nature of Fox's Debt**

The FDCPA does not govern all debts. Rather, it only governs debts that arise "out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 5 U.S.C. § 1692a(5). To state a claim under the FDCPA, Fox needs to allege that the money she obtained through the

mortgage loan was primarily used for personal, family, or household purposes.

To start, Fox's conclusory statement that "the Loan is a debt within the meaning of the FDCPA" should be disregarded when considering the factual sufficiency of the complaint. *See Twombly*, 550 U.S. at 555 (2007) ("[A] formulaic recitation of the elements of a cause of action will not do."). Aside from that statement, Fox provides very little detail about how she used the loan proceeds at issue. She alleges that she lived in the Kedzie home and that the underlying mortgage that gave rise to this dispute was taken out against the Kedzie home. But she does not state whether the loan was used to finance the home, refinance a prior mortgage, or used for some other purpose altogether. Still, even with these minimal allegations, it is reasonable to infer at this stage in the litigation that the mortgage loan proceeds were used in relation to the Kedzie home.

If we assume the loan was used in relation to the Kedzie home, the issue becomes whether that home was used for personal purposes. Fox alleges that it was. MDK challenges this allegation by pointing to Fox's bankruptcy filings which show the home was rented out to a tenant in both 2013 and 2015. These filings also reveal Fox owned ten other properties that she leased out to tenants. MDK also states that Fox was not at her residence when the defendants tried to serve her.

These facts alone are insufficient to discredit Fox's statement that she used the Kedzie home as a primary residence. It is plausible that she was out of town when the defendants attempted service and possible that she rented out portions of a home she otherwise uses as a primary residence. Fox says in her brief that she used the Kedzie home as her address when filing for bankruptcy and listed it as exempt from those proceedings, suggesting it was her primary home.

Certainly at a later point in the litigation, Fox would need to provide much more to explain the tenant's presence, her other properties, and her absences from the home. But at this stage, when the Court draws inferences in Fox's favor, it is reasonable to conclude that Fox lived at the Kedzie home and she used the mortgage loan for some purpose related to that home. Fox has sufficiently alleged that the transaction at issue in this case is covered by the FDCPA and that she is a consumer for purposes of this statute.

**2.     Fox's Claims Under § 1692d**

Fox can only state a claim under the FDCPA if she has alleged a violation of one of its provisions. Section 1692d of the FDCPA prohibits a debt collector from engaging in "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." § 1692d. The statute lists examples of § 1692d violations including threatening the use of violence to collect a debt, using obscene or profane language, or using a telephone to annoy, abuse, or harass a person into paying debt. *Id*. To state a claim under § 1692d, the alleged actions "should be similar in seriousness to these examples." *Bonfiglio v. Citifinancial Servicing, LLC*, No. 14 C 9254, 2015 WL 5612194, at *10 (N.D. Ill. Sept. 23, 2015).

Fox alleges that MDK violated § 1692d when it published three notices of the foreclosure sale. Such conduct is not serious enough to violate the § 1692d. In *Bonfiglio*, the defendant loan servicer allegedly misrepresented the status of the plaintiff's debt, attempted to collect fees from the plaintiff, and falsely declared the plaintiff in default of the debt. *Id.* These allegations did not rise to the level of "actionable harassing or oppressive conduct" as is required for a § 1692d claim *Id.* at *11. The allegations here are no more serious than the *Bonfiglio* allegations. MDK allegedly took actions based on the allegedly false belief that Fox had not yet earned a permanent

15

loan modification. Just as the *Bonfiglio* defendant operated under false declarations that the plaintiff was in default, MDK allegedly relied on legal conclusions that Fox considered incorrect. MDK's reliance on these conclusions does not rise to the level of criminality, harassment, or oppression that is required for a § 1692d claim. Thus Fox has failed to allege facts to state a claim against MDK under § 1692d.

**3.     Fox's Claims Under § 1692e**

Section 1692e of the FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." § 1692e. In her Complaint and her Response to MDK's Motion, Fox alleges that MDK violated § 1692e on three instances: (1) when MDK attorneys told Fox's attorney that the Kedzie home would be subject to a sheriff's sale even though Fox had informed MDK that such a sale was barred by the terms of the TPP, (2) when MDK published notices of the foreclosure sale, even though it knew of Fox's position that she had complied with the TPP, and (3) when MDK "took no steps to halt the sale."

None of these allegations involves a direct communication between MDK and Fox. While the representations made to Fox's attorney are subject to FDCPA regulation, they are subject to a higher standard. *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 775 (7th Cir. 2007). When an allegedly false representation is made to a consumer's attorney, the communication must be likely to "deceive a competent lawyer" to be actionable under the FDCPA. *Id.* MDK said nothing here to Fox's attorney that would confuse, mislead, or deceive a competent attorney. Fox's attorney offered Fox's position on the legal status of the foreclosure, and MDK stated that it disagreed and discussed the consequences that would flow from that disagreement. Nothing in the FDCPA compels MDK to adopt the borrower's position in a

16

dispute over whether the borrower sufficiently complied with a TPP. Section 1692e requires more than disagreement with the consumer attorney. Fox's core grievance with MDK is that the law firm did not do more to bring Seterus into compliance with the terms of the TPP. This behavior does not involve any deception or misrepresentations on the part of MDK against Fox.

The foreclosure notices also did not mislead Fox or Fox's attorney in anyway. The notices were issued pursuant to a state court order for a foreclosure. While Fox can challenge the legality of such a foreclosure given her interpretation of the TPP and Seterus's alleged errors in processing the TPP, the FDCPA does not require Seterus's attorney to adopt the borrower's view of the law. At the time the foreclosure notice was published, it was true that a foreclosure was planned. Thus Fox has failed to allege the kind of false, deceptive, or misleading statements required to state a claim under § 1692e.

4.   **Fox's Claims Under § 1692f**

Section 1692f of the FDCPA prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt." § 1692f. While the phrase "unfair and unconscionable" is vague, the Seventh Circuit has held that the enforcement of state judicial judgments falls outside the scope of this section. *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 475 (7th Cir. 2007).

Nothing alleged here is unfair or unconscionable. As stated above, MDK allegedly pursued the enforcement of a state proceeding and refused to adopt Fox's interpretation of the TPP. There is nothing unconscionable about MDK's pursuit of Seterus's position that Fox had not complied with the TPP and had not earned a permanent loan modification.

Having failed to allege any conduct by MDK that would violate a provision of the FDCPA, Fox has failed to state a claim under that statute. I am granting MDK's Motion to

Dismiss in its entirety and dismissing all counts against MDK from the Complaint.

## CONCLUSION

For the reasons stated above, Seterus's Motion to Dismiss is granted as to Fox's promissory estoppel claim and Fox's claim under ICFA. Seterus's Motion to Dismiss Fox's claim for breach of contract and Fox's claims under RESPA are denied.

MDK's Motion to Dismiss is granted as Fox has failed to state a claim under the FDCPA.

ENTER:
James B. Zagel
United States District Judge

DATE: October 19, 2016